Civello Giuseppina **NOTO**, etc., et al.,
Plaintiffs,

v.

**CIA SECULA di ARMANENTO** et al.,
Defendants.

Giuseppa **MARINO**, etc., et al., Plaintiffs,

v.

**CIA SECULA di ARMANENTO** et al.,
Defendants.

Alberto **ALBERTANI**, etc., Plaintiff,

v.

**CIA SECULA di ARMANENTO** et al.,
Defendants.

Loreta di Fazio **D'AGNESE**, etc.,
Plaintiff,

v.

**CIA SECULA di ARMANENTO** et al.,
Defendants.

Giuseppe **MIGLIORINO** et al., Plaintiffs,

v.

**GOVERNMENT OF IRAN** et al.,
Defendants.

Nos. 68 Civil 2218, 68 Civil 2263, 68 Civil
2307, 68 Civil 2552, 68 Civil 3461.

United States District Court,
S. D. New York.

Feb. 16, 1970.

Jacob Rassner, Francis J. Nicosia, Shafter & Shafter, New York City, for plaintiffs, in all actions.

Sullivan & Cromwell, New York City, for defendant The British Petroleum Co. Ltd., in all actions, Robert MacCrate, James E. Blackwood, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants Standard Oil Co. (Ohio), Texaco, Inc., The Signal Companies, Inc., in all actions, John L. Quinlan, New York City, of counsel.

Joseph Cardillo, Jr., New York City, for defendants Dowd Shipping, Inc. and Cia Secula di Armanento in 68 Civil 2218, 68 Civil 2263, 68 Civil 2307, 68 Civil 2552.

Kirlin, Campbell & Keating, New York City, for defendant Standard Oil Co. (N.J.), in all actions, Louis J. Gusmano, James B. Magnor, New York City, of counsel.

Lee, Mulderig & Celentano, and Frederick L. Scofield, New York City, for defendant Gulf Oil Corp., in all actions.

Haight, Gardner, Poor & Havens, New York City, for defendants Atlantic Richfield Co., sued herein as Atlantic Refining Co. and Richfield Oil Corp., in all actions, David P. H. Watson, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant Standard Oil Co. of California in 68 Civil 2218, and 68 Civil 2263, Ralph L. McAfee, John M. Linsenmeyer, New York City, of counsel.

Homer W. Lane, New York City, for defendant Mobil Oil Corp., in all actions.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for defendants Getty Oil Co., Tidewater Oil Co., American Independent Oil Co., in all actions, Allan B. Lutz, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendant Compagnie Francaise des Petroles in 68 Civil 2218, 68 Civil 2263, 68 Civil 2307, 68 Civil 2552, Porter R. Chandler, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

On June 5, 1965, the Italian-owned oil tanker LUISA exploded and was destroyed by fire while loading crude oil at the port of Bandar Mah Shahr (then known as Bandar Mashur), Iran. Thirty-one of the tanker's crew of forty-one perished in the disaster. These are five actions brought on behalf of the next of kin of twenty-eight deceased crew members and by seven injured survivors. All the plaintiffs are nationals and residents of Italy, as were the deceased crew members. The dependents of the deceased crewmen and the surviving crew members have been paid indemnities or are receiving pensions to which they are entitled under Italian law. The claims here asserted are for a maritime tort in the territorial waters of Iran.

The LUISA was of Italian registry and was owned by an Italian corporation, Cia Secula di Armanento (Cosarma), which was the sole employer of her crew. At the time of the disaster the LUISA was under time charter to BP Tanker Company Ltd. (BP Tanker), a subsidiary of The British Petroleum Company Limited (British Petroleum). The oil being loaded aboard the vessel at the time of the disaster had previously been acquired by Oil Trading Company (Iran) Ltd. (Oil Trading) at the wellhead from where it had been transported to the pier. Oil Trading sold the oil and passed title thereto at the ship's rail to BP Trading Company Limited (BP Trading). Both Oil Trading and BP Trading are also subsidiaries of British Petroleum.

The oil terminal and loading facilities were under the exclusive operation and control of the Iranian Oil Exploration and Producing Company (IOEP), a Dutch corporation with its principal office in Iran. IOEP in turn was the wholly owned subsidiary of Iranian Oil Participants Ltd. (IOP), a British corporation. IOP shares were and are held directly or indirectly by many of the world's major oil companies, members of the "Iranian Oil Consortium of 1954," of which more hereafter. The reversionary interest in the terminal and loading facilities at Bandar Mah Shahr was vested in the National Iranian Oil Company (NIOC), an Iranian corporation, owned by the Iranian government.[1]

■■ The defendants named in these actions are domestic corporations, foreign corporations of Britain, the Netherlands, France, Italy and Iran, and the Government of Iran. In all, twenty-three defendants are named in the five complaints. Of these, sixteen are named in all five actions,[2] two in four,[3] and

1. The facts concerning the LUISA disaster and the corporate organization of the petroleum industry in Iran as stated in this opinion are derived largely from uncontested statements in defendants' affidavits and from defendants' papers filed pursuant to Rule 9(g) of the General Rules of this Court relating to summary judgment. That Rule in pertinent part provides: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Since plaintiffs have served no controverting statement, defendants' version of the material facts in their statements must be deemed admitted. The Court could have reached the same conclusions on the basis of the affidavits and supporting documents alone.

2. All five complaints name: The British Petroleum Company Limited; The Ba-

3. See note 3 on page 643.

five in one only.[4] However, of the twenty-three named defendants, seven, including the shipowner and the operator of the loading facilities, were never served with process,[5] and one still has time to answer.[6] The claims against two defendants, Dowd Shipping, Inc. and Tidewater Oil Company, are so patently frivolous that their motions for summary judgment may be granted without further discussion.[7]

The remaining thirteen defendants,[8] all major oil companies, move to dismiss the complaints on the grounds that (1) under controlling principles of applicable foreign law they fail to state a claim upon which relief can be granted; and (2) this district is forum non conveniens. In addition, several defendants move to dismiss on the ground that the actions are barred by the statute of limitations, and a number dispute jurisdiction over them.[9]

---

taafsche Petroleum Maatschappij, N.V. (Royal Dutch Shell Group); Gulf Oil Corporation; Socony Mobil Oil Company Inc.; *Standard Oil Company (New Jersey)*; Standard Oil Company of California; Texaco Incorporated; Compagnie Francaise des Petroles; American Independent Oil Company; The Atlantic Refining Company; Getty Oil Company; Richfield Oil Corporation; San Jacinto Petroleum Corporation; Signal Oil & Gas Company; The Standard Oil Company (Ohio); and Tidewater Oil Company.

In their answering papers, several of these defendants have indicated that, due to changes in their corporate title or form, they are named incorrectly in the complaints. Socony Mobil Oil Company Inc. is now the Mobil Oil Corporation. Signal Oil & Gas Company is now The Signal Companies, Inc. The Atlantic Refining Company and Richfield Oil Corporation have merged to form the Atlantic Richfield Company. The Tidewater Oil Company presents a special problem, for a discussion of which see note 7 *infra*. In addition, the complaints make a number of minor errors in the statement of defendants' names which it is unnecessary to mention.

3. In Nos. 2218, 2263, 2307, 2552: Dowd Shipping, Inc. and Cia Secula di Armanento (Cosarma).

4. In No. 3461: the Government of Iran; National Iranian Oil Company (NIOC); Iranian Oil Exploration and Producing Company (IOEP); Iranian Oil Refining Company (IOR); and Iranian Oil Participants Limited (IOP).

5. Cia Secula di Armanento (Cosarma) (the shipowner); Iranian Oil Exploration and Producing Company (IOEP) (the operator of the loading facilities); Iranian Oil Refining Company (IOR); Iranian Oil Participants Limited (IOP); The Bataafsche Petroleum Maatschappij,

N.V.; San Jacinto Petroleum Corporation; the Government of Iran. In addition, the Standard Oil Company of California was served only in Nos. 2218 and 2263.

6. National Iranian Oil Company (wholly owned by the Government of Iran).

7. The plaintiffs' complaints, contradicting their own pleading that Cosarma was the owner of the LUISA, also allege that Dowd Shipping, Inc. was the owner. Dowd Shipping, Inc. not only denies ownership or any interest in the vessel, but affirmatively disclaims any connection with the charter of the LUISA by BP Tanker, with the terminal and loading facilities at Bandar Mah Shahr, or with any of the oil companies engaged in Iran. Since plaintiffs do not contradict these sworn averments, there is no basis upon which to hold Dowd in the action. Accordingly, its motion for summary judgment is granted.

So, too, plaintiffs do not contest the sworn statement that the present Tidewater Oil Company was not in existence at the time of the LUISA disaster and that it has no connection with the prior Tidewater Oil Company, which was then in existence "except the fact that the name is the same." Consequently, Tidewater Oil Company's motion to dismiss is treated as one for summary judgment and is granted. Parenthetically, it is observed that the old Tidewater Oil Company was merged into the Getty Oil Company, which is a defendant before the Court.

8. Really 12, since, as indicated in note 2 *supra*, The Atlantic Refining Company and the Richfield Oil Corporation, have merged to form the Atlantic Richfield Company.

9. Atlantic Richfield Company and Compagnie Francaise des Petroles have challenged personal jurisdiction in all 5 actions; The Signal Companies, Inc. in

I. Failure to state a claim under controlling foreign law.

To place the matter in proper focus, it should be observed that upon this record there can be no dispute that IOEP at the time of the disaster had control and the sole responsibility for the operation and maintenance of the oil terminal and loading facilities, and was then engaged in the loading operation together with the crew and personnel of the LUISA. The only others at the scene who may be said to be involved in the disaster were Oil Trading, the owner of the crude oil at the time of its delivery to the LUISA; BP Trading, the purchaser of the oil from Oil Trading; and BP Tanker, the time charterer of the LUISA. All of these, whatever their participation in the tragic event, have not been named as defendants or, if named, have not been served.

Equally, there is no dispute that none of the remaining oil company defendants in this action had any direct role in, or in any way was connected with or responsible for, the purchase, sale, loading or transportation of the oil loaded or intended to be loaded aboard the LUISA, or was involved with the operation or maintenance of the port facility. Nonetheless, the plaintiffs seek to hold the defendants liable for the disaster. They rely upon the defendants' membership in

the Iranian Oil Consortium of 1954 created in that year by agreement with the Imperial Government of Iran (Agreement) to continue for a term of twenty-five years. The Agreement sets forth detailed procedures for the production, refinement and marketing of Iranian oil by the Government of Iran and the foreign member corporations. The Consortium members do not themselves operate the oil producing and refining facilities in Iran. Those functions are performed by two "Operating Companies," IOEP, already mentioned, and Iranian Oil Refining Company (IOR), both incorporated under the laws of the Netherlands, but with their principal offices in Iran.[10] IOEP explores for and produces crude oil and also natural gas; IOR refines crude oil produced by IOEP. Each Consortium member has the right to transfer all or part of its interest in the Consortium and also to incorporate subsidiary "Trading Companies" to purchase oil from NIOC for export from Iran. Any transferee or Trading Company becomes a party to the Agreement and is bound by its terms.[11]

IOP, a British corporation with offices in London, owns all the stock of IOEP and also of IOR. The original Agreement did not provide for IOP, which was later set up by the Consortium members, each receiving the percentage of IOP

Nos. 2218, 2307, 2552 and 3461; and Standard Oil Company of California in Nos. 2218 and 2263, the only two actions in which it was served. Since the jurisdictional issue must be resolved before considering the substantive questions, Arrowsmith v. United Press International, 320 F.2d 219, 221–222, 6 A.L.R.3d 1072 (2d Cir. 1963), the Court called a conference on this as well as other issues, and at that time plaintiffs' counsel conceded that service on these 4 defendants was invalid. Subsequently, in a brief, they sought to disaffirm this acknowledgment upon a claim that, since those defendants had also moved to dismiss upon substantive grounds, they had submitted to the Court's general jurisdiction. The contention is patently frivolous. As the Rules state: "No defense or objection is waived by being joined with one or more other defenses or objections in a

responsive pleading or motion." Fed.R. Civ.P. 12(b). It has been explicitly held that even a "voluntary general appearance" does not constitute waiver of the defense of lack of jurisdiction over the person. Kerr v. Compagnie de Ultramar, 250 F.2d 860, 864 (2d Cir. 1958). To the same general effect is United States v. Balanovski, 236 F.2d 298, 303 (2d Cir. 1956), cert. denied, 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 (1957). In any event, even had jurisdiction been acquired over these defendants, they would have prevailed on the merits, as do the other oil companies (Consortium defendants), and for the same reasons.

10. See generally the Agreement, Arts. 3 and 4, pp. 5–10.

11. Agreement, Art. 18(A), (B), p. 26; Art. 39, p. 44.

stock proportionate to its interest in the Consortium. At the time of the LUISA disaster, each remaining defendant herein, as a Consortium member, either directly or indirectly through a subsidiary, was a stockholder in IOP. Thus the sole connection of each remaining defendant with the catastrophe was as an indirect stockholder of IOEP, except that British Petroleum's alleged connection also arises through BP Tanker, Oil Trading and BP Trading, its subsidiaries.

The plaintiffs seek to hurdle the well-defined corporate structure of the Consortium and to hold the defendants herein liable for the tort claims upon the ground that as Consortium members they shared responsibility for the alleged failure of IOEP to supervise properly the piers and docks at the port of Bandar Mah Shahr and for permitting the improper loading of the oil aboard the LUISA; according to plaintiffs, each defendant as a Consortium member was a joint tortfeasor with IOEP. What plaintiffs seek to do is, first, to pierce the corporate veil of IOEP; next, that of IOP; then, to bypass the subsidiary corporations through which most defendants own their shares in IOP; and thus finally to reach the parent corporations, the Consortium members.[12] To achieve this result, which would disregard the doctrine of stockholder immunity from corporate obligation so firmly entrenched in our legal and economic system, plaintiffs must offer substantial reasons.

Although plaintiffs' contentions are not clearly articulated, and at times even contradictory, they suggest two grounds on which it is urged that Consortium members can be reached: (1) that New York law governs in defining the relationship of the parties under the 1954 Agreement, and that under applicable New York principles the Consortium members were engaged in a joint venture which imposed upon each liability for the torts committed in furtherance of the venture; and (2) that IOEP was the "alter ego" of the Consortium members and their agent in the management of the docks and loading facilities at Bandar Mah Shahr. With respect to British Petroleum, it is also contended that its subsidiaries, BP Tanker, Oil Trading and BP Trading, were similarly its "alter egos" and agents.

Plaintiffs base their argument that New York law determines the status of the signatories to the Agreement on the contention that it was consummated in New York, where a number of United States oil companies executed the Agreement—"the last act necessary to give [it] binding effect";[13] further, they argue that "[t]he contract in question, the Consortium Agreement, invokes by its very terms the provisions of United States and New York law."[14] These contentions not only misstate the terms of the Agreement, but also the fact as to its consummation. The Agreement, by its very terms, was not to become effective until approved by the Iranian Government.[15] Both Houses of the Iranian Parliament passed the required legislation and then the Royal Decree making it effective was issued in Iran, subsequent to the signing of the Agreement by

12. Only British Petroleum and Compagnie Francaise des Petroles are direct stockholders in IOP. In the case of the other defendants, the indirect stockholder interest is several times removed. And to reach the ultimate parent one must pierce not one but many corporate veils. For example, at the time of the LUISA disaster, Standard Oil Company (New Jersey) owned all the stock of Esso International, Inc., which owned all the stock of Mediterranean Standard Oil Company, which owned all the stock of Esso Trading Company of Iran, which owned 7% of the stock of IOP, which in turn owned all the stock of IOEP.

Similar, though slightly less complex, corporate structures separate the other parent oil company defendants from their holdings in IOP and, even beyond, in IOEP.

13. Brief for plaintiffs, p. 18.

14. Affidavit of Jacob Rassner, January 21, 1969, ¶ 2(b) pp. 1–2.

15. Agreement, Art. 51, p. 56.

the Consortium members, including those who signed in New York.[16] Moreover, plaintiffs' averment that the Agreement invokes "by its very terms the provisions of United States and New York law" is upon its face also specious.[17] But even were plaintiffs' position sound, New York law is clear that a joint venture cannot be conducted through a corporation. "[T]he rule is well settled that a joint venture may not be carried on by individuals *through* a corporate form. [citations omitted] The two forms of business are mutually exclusive, each governed by a separate body of law." [18]

[7, 8] Plaintiffs' further contention that the corporate identities of IOEP, the other subsidiaries and the British Petroleum subsidiaries should be disregarded because they are the "alter egos" and agents of their parent corporations is equally groundless. The undisputed fact is that IOEP is a solvent and substantial corporation with net assets of over 200 million dollars; it operated, maintained and controlled the port facility entirely independently of IOP, its parent, and of IOP's direct or indirect shareholders. It functioned as a separate corporate unit, as it was set up to function under the Agreement. Stock ownership by itself is insufficient to charge a parent company for the torts of its subsidiary. Except for the unsupported allegation in the complaint and unsubstantiated statements of plaintiffs' counsel, not a single evidentiary fact has been submitted to suggest that the defendants here, except for their stock interest in IOP, played the slightest role in directing or controlling the operations or functions of IOEP, and the same is true with respect to the British Petroleum subsidiaries. And so, too, there is not the slightest basis for any contention that IOEP, IOP or any British Petroleum subsidiary was used by the defendants as a sham or decoy or a conduit to defraud or defeat the rights of third parties.

16. Agreement, Note Regarding Ratification of and Royal Assent to The Government Agreement, pp. 70–71.

17. Article 46 of the Agreement, p. 52, provides: "In view of the diverse nationalities of the parties to this Agreement, it shall be governed by and interpreted and applied in accordance with principles of law common to Iran and the several nations in which the other parties to this Agreement are incorporated, and in the absence of such common principles, then by and in accordance with principles of law recognized by civilized nations in general, including such of those principles as may have been applied by international tribunals." This Article, by its terms, adopts only principles of law *common* to Iran and the nations in which the other parties to the Agreement are incorporated, not New York or United States law. In any case, the Article is a choice of law provision, inserted by the parties to the Agreement to govern their relationship *inter sese*. Whatever result it would dictate, it is not determinative in resolving the choice of law in a suit against the Consortium members by third-party tort plaintiffs who are not parties to the Agreement.

18. Weisman v. Awnair Corp. of America, 3 N.Y.2d 444, 449, 165 N.Y.S.2d 745, 144

N.E.2d 415 (1957). *See* Hochen v. Rubin, 24 App.Div.2d 254, 257–258, 265 N.Y.S.2d 554, 557–558 (1st Dep't 1965), *aff'd mem.*, 18 N.Y.2d 866, 276 N.Y.S.2d 119, 222 N.E.2d 737 (1966); Färber v. Romano, 232 N.Y.S.2d 285, 286 (Sup.Ct. 1962); Lauto v. Muller, 36 Misc.2d 208, 231 N.Y.S.2d 947, 948 (Sup.Ct.1962); Loverdos v. Vomvouras, 23 Misc.2d 464, 465, 200 N.Y.S.2d 921, 923–924 (Sup.Ct. 1960). *See also* Nager Elec. Co. v. Office of General Services, 56 Misc.2d 975, 977, 290 N.Y.S.2d 943, 946 (Sup.Ct.1967), *aff'd mem. on other grounds*, 30 App.Div. 2d 626, 290 N.Y.S.2d 947 (3rd Dep't 1968).

The Court is aware that in Arditi v. Dubitzky, 354 F.2d 483 (2d Cir. 1965), the Court of Appeals interpreted certain later New York cases as limiting the *Weisman* holding. However, *Arditi* dealt solely with the relationship of the joint venturers among themselves. As the Court of Appeals commented: "There is little logical reason why individuals cannot be 'partners *inter sese* and a corporation as to the rest of the world,' as long as the rights of third parties such as creditors are not involved." 354 F.2d at 486. Here plaintiffs are such third parties, and the *Arditi* modification of Weisman is inapplicable.

■ Upon the facts here presented, Iranian, Dutch or Italian law would govern on the issue of whether the corporate veil may be pierced and the Consortium members held individually liable.[19] The opinions of legal experts, unchallenged by plaintiffs, and the foreign legal material [20] leave no room to doubt that under any of the aforesaid foreign laws, whichever may be applicable by choice of law principles, IOEP's corporate entity would be respected, as would that of the British Petroleum subsidiaries—in sum, that plaintiffs' claims for the alleged tort liability can only be asserted against those corporate entities, and that their stockholders, direct or indirect, are (absent circumstances not here present) exempt from personal liability for those claims.

■ The plaintiffs advance theories; the Court decides upon facts.[21] Where, as here, the solvency of the subsidiaries is unquestioned, where the outward indicia of the corporate form have been carefully maintained, and where the corporate form has not been used to defraud, there is no equitable reason whatsoever to pierce the corporate veil.[22] To do so would do violence to the concept of separate corporate identity and the stockholder relationship which the law recognizes "for the very purpose of escaping personal liability." [23] Since affidavits have been submitted on the motions to dismiss for failure to state a claim, they are treated as motions for summary judgment under Rule 56 and are granted.

## II. The motion to dismiss for forum non conveniens.[24]

■ And even if plaintiffs' complaints were sufficient to withstand the motion to dismiss for failure to state a claim, the defendants are entitled to dismissal upon the ground of forum non conveniens.[25] The factors favoring re-

19. See Romero v. International Terminal Operating Co., 358 U.S. 354, 382–383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); Lauritzen v. Larsen, 345 U.S. 571, 582, 73 S. Ct. 921, 97 L.Ed. 1254 (1953). See also Scognamiglio v. Home Lines, Inc., 246 F. Supp. 605 (S.D.N.Y.1965). Although BP Tanker, BP Trading and Oil Trading are all British corporations, plaintiffs do not contend that British law is applicable. The fact is that, other than their incorporation in Britain, no incident relating to the disaster occurred there.

20. Fed.R.Civ.P. 44.1.

21. Cf. Bowater S. S. Co. v. Patterson, 303 F.2d 369, 372 (2d Cir.), cert. denied, 371 U.S. 860, 83 S.Ct. 116, 9 L.Ed.2d 98 (1962).

22. The same result would follow under New York law. Walkovszky v. Carlton, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966); Bartle v. Home Owners Cooperative, Inc., 309 N.Y. 103, 127 N.E.2d 832 (1955); Berkey v. Third Ave. Ry., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599 (1926); Elenkrieg v. Siebrecht, 238 N.Y. 254, 144 N.E. 519, 34 A.L.R. 592 (1924); Lowendahl v. Baltimore & O. R. R., 247 App.Div. 144, 287 N.Y.S. 62 (1st Dep't), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936). In fact, in New York creditors of a subsidiary can generally not recover from a parent corporation or its stockholders until they have exhausted their remedies against the subsidiary itself. Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 266 F.Supp. 79, 82–83 (S.D.N.Y.1967); see Netley Offices v. Burgundy Realty Corp., 238 App. Div. 559, 563, 265 N.Y.S. 356, 360–361 (1st Dep't 1933), aff'd mem., 265 N.Y. 581, 193 N.E. 330 (1934).

23. Bartle v. Home Owners Cooperative, Inc., 309 N.Y. 103, 106, 127 N.E.2d 832 (1955).

24. We deal here with the doctrine of forum non conveniens as distinguished from a motion for transfer from one district to another under 28 U.S.C. § 1404 (a). See Norwood v. Kirkpatrick, 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789 (1955).

25. The defendants contend, for various reasons advanced by them, that these actions are cognizable only in admiralty, where the doctrine was initially applied. See The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152 (1885). However, it is not necessary to pass upon their contention since the doctrine has been extended to actions at law and in equity under federal jurisdiction. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); Koster v. (American) Lumbermen's Mut. Cas. Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

fusal of jurisdiction under that doctrine are overwhelming. Except for the circumstance that the attorneys of record for the plaintiffs maintain their offices in this district, normally a factor of little significance [26]—and even of less significance in this case [27]—not a single contact within this district justifies the filing of these lawsuits here. As already noted, the LUISA disaster occurred in Iran; the plaintiffs are all Italian nationals and residents, as were the decedent crew members; the ship herself was of Italian registry and ownership. The operator of the oil loading facilities (IOEP), the shipowner (Cosarma), the time charterer (BP Tanker), the owner of the title to the oil immediately prior to the loading (Oil Trading), and the transferee of title upon loading (BP Trading), all not subject to service of process, are not before the Court. Witnesses to the explosion, said to number more than forty, and records pertaining to the disaster are all either in Iran or Italy and available only there. Every source of evidence, whether pertaining to the issue of negligence or to the alleged individual liability of the defendants as indirect stockholders, is in a foreign land. Under the choice of law standards applied by our courts to maritime claims, whether jurisdiction is in admiralty or diversity, foreign law, either Italian or Iranian, would be applied to determine the substantive rights of plaintiffs.[28] If the case were retained here, our courts would be called upon to resolve complex issues of foreign law.[29] Despite these overwhelming factors, which strongly support refusal of jurisdiction, plaintiffs contend that dismissal of these suits is foreclosed, since the doctrine of forum non conveniens "presupposes at least two forums in which the defendant is amenable to process; [it] furnishes criteria for choice between them." [30] They argue that none of the defendants here is amenable to process in an obviously more convenient foreign forum; nor has any defendant agreed to submit to such foreign jurisdiction. In sum, plaintiffs contend that upon this ground alone the Court is without discretion in the matter and lacks power to decline to entertain jurisdiction. This Court does not agree.

■ Essentially, the discretion which the Court is called upon to exercise under the doctrine, which had its birth in admiralty and later was extended to other causes under federal jurisdiction, invokes the Court's inherent power to decline jurisdiction "in the interest of justice." [31] The Court does not act in a vacuum, but upon a realistic appraisal of facts in exercising its discretion. It is true that in Gulf Oil Corp. v. Gilbert and its progeny and predecessors the Supreme Court reviewed cases where the courts had exercised discretion in accepting or declining jurisdiction where defendants were subject to process and jurisdiction in other forums, but it is also clear that the discretion was exercised with respect to defendants against whom upon its face a meritorious claim was alleged. The cases did not involve defendants against whom, as in this instance,

26. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

27. See discussion pp. 649, 650 infra.

28 See Romero v. International Terminal Operating Co., 358 U.S. 354, 382–383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); Lauritzen v. Larsen, 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

An expert on Italian law states that an Italian court would apply the substantive law of Iran to determine tort liability, in view of the situs of the disaster. Affidavit of Berlingieri, September 20, 1968, ¶ 33.

29. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); Fitzgerald v. Westland Marine Corp., 369 F.2d 499, 502 (2d Cir. 1966).

30. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 842 (1947).

31. Canada Malting Co. v. Paterson Steamships, Ltd., 285 U.S. 413, 423, 52 S.Ct. 413, 76 L.Ed. 837 (1932); cf. Baltimore & O. R. R. v. Kepner, 314 U.S. 44, 57, 62 S.Ct. 6, 86 L.Ed. 28 (1941) (Frankfurter, J., dissenting).

palpably specious and legally baseless claims are asserted.

 Inquiry by the Court as to the integrity of the alleged claims is not foreclosed; indeed, the Court's power of inquiry exists no less here than in instances of colorable assignments given to avoid limitations upon jurisdiction; such evasions may be disregarded.[32] Otherwise a plaintiff, by the simple device of naming a defendant against whom not even a colorable claim is alleged and who is not subject to process and jurisdiction in another forum, could effectively prevent consideration by the Court of the doctrine of forum non conveniens. The Supreme Court itself, in Gulf Oil Corp v. Gilbert,[33] observed:

"This Court, in one form of words or another, has repeatedly recognized the existence of the power to decline jurisdiction in exceptional circumstances. As formulated by Mr. Justice Brandeis, the rule is:

'Obviously, the proposition that a court having jurisdiction must exercise it, is not universally true; else the admiralty court could never decline jurisdiction on the ground that the litigation is between foreigners. Nor is it true of courts administering other systems of our law. Courts of equity and of law also occasionally decline, in the interest of justice, to exercise jurisdiction, where the suit is between aliens or non-residents or where for kindred reasons the litigation can more appropriately be conducted in a foreign tribunal.' Canada Malting Co., Ltd. v. Paterson Steamships, Ltd., 285 U.S. 413, 422–423 [52 S.Ct. 413, 415, 76 L.Ed. 837]."

 The plaintiffs' asserted claims have no relationship to or contact with this district, or for that matter with any jurisdiction in the United States. The hard, realistic fact is that the basic controversy is one between foreign plaintiffs on the one side and foreign corporations, IOEP, Cosarma and BP Tanker, on the other. The doctrine of forum non conveniens protects not only the immediate defendant from harassing and vexatious litigation, but also other litigants and the community at large from unwarranted imposition upon the local courts' jurisdiction.

"Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation."[34]

These cases, which present legal and factual issues of substantial complexity, have already delayed and would necessarily delay still further other litigants whose right to our judicial process is unquestioned.

 An additional consideration supports dismissal of these actions. The Court must be concerned with and cannot disregard another aspect of the matter[35] —how it came about that these suits were commenced in a court of the United States in "a community which has no relation to the litigation." This Court's study of the voluminous papers and briefs submitted on these motions revealed that in April 1968, prior to the filing of these actions, letters had been sent by an out-of-state attorney[36] to the

---

32. *See* Wittig v. Canada S. S. Lines, Ltd., 59 F.2d 428, 430 (W.D.N.Y.1932); *cf.* United States Merchants' & Shippers' Ins. Co. v. A/S Den Norske Afrika Og Australie Line, 65 F.2d 392, 393 (2d Cir. 1933).

33. 330 U.S. 501, 504, 67 S.Ct. 839 (1947).

34. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508–509, 67 S.Ct. 839, 843 (1947).

35. *Cf. In re* Association of the Bar of the City of New York, 222 App.Div. 580, 586–587, 227 N.Y.S. 1, 8–9 (1st Dep't 1928).

36. In violation of Rule 3(c) of the General Rules of this Court the attorney's name was listed on the original complaint and subsequent pleadings as of counsel and also as one of the attorneys of record to-

families of the disaster victims.[37] The letters were accompanied by a "CONTINGENT FEE AGREEMENT" to be signed by the addressee. The Court sought further information from the attorneys with respect to the matter, and what was submitted obscured rather than clarified the circumstances of the retention of the out-of-state attorney, who in turn retained local counsel. The Court then directed that all persons having knowledge of the facts appear at a hearing. While local counsel of record attended and participated in the hearing, the out-of-state attorney failed to appear, but sent a long, rambling document containing many self-serving statements. But it also contained sufficient to indicate blatant solicitation by him of retainers from the plaintiffs herein [38] which transcended ethical standards,[39] if not statutory prohibitions.

The courts would be derelict if they supinely stood by, aware that improper practices had flooded their dockets with litigation that truly belongs in another forum. The courts have "inherent power to protect [themselves] from a deluge of litigation by nonresidents, inspired by contingent retainers to avoid or overcome foreign laws and interpretation and application thereof by foreign courts * * *." [40] Thus, the circumstances which led to the retention of plaintiffs' lawyers in this district and the conse-

quent filing of the actions here give added reason for declining jurisdiction.

Finally, to decline jurisdiction in these actions deprives plaintiffs of no rights. Their claims can be litigated upon the merits in Italy, their own country, since a five-year statute of limitations applies.[41] Cosarma, a corporation of Italy, is subject to jurisdiction there if plaintiffs decide to sue. Additionally, the active alleged tortfeasors, Cosarma, IOEP, NIOC and BP Tanker, are engaged in litigation before the Tribunal of Rome, wherein each seeks to cast liability upon another for the LUISA disaster. Since plaintiffs' claims are based upon the tortious acts that are the subject of that litigation, under Italian law they may intervene and thus acquire jurisdiction over the non-Italian corporations. Plaintiffs are also in a position to assert their claims against Cosarma in an action commenced against them by the latter in the Tribunal of Venice for a declaratory judgment that it is not liable to them.

Moreover, whether plaintiffs file separate suits, intervene in the Tribunal of Rome litigation, or assert their claims in the declaratory judgment action, they will have the immense advantage of the testimony of all witnesses who reside either in Iran or Italy and of the massive documentary material which Cosarma, IOEP, NIOC and BP Tanker, as oppos-

gether with the local attorneys of record. His name has since been stricken. *See* Minutes of Hearing, January 9, 1970.

37. The letters in part read:
"Dear Friend:
* * * * *

"Please observe my enclosed contract! Note! You pay no expense monies either now or later. I pay *all* expenses. My fee depends upon the success of the case. I collect my fee *only* from money I collect for you. *You have nothing to lose and thousands of dollars to gain.*
"You must act quicky. *Do not delay!* Complete the contract now."

38. The names and addresses of these potential litigants were obtained by a ruse employed by the out-of-state attorney. Under a female pseudonym, using his own address in Seattle, Washington, he

sent a letter to the Italian Ministry of Merchant Marine requesting the names and addresses of the crew of the LUISA at the time of the disaster "for entry in our maritime publication." In consequence he obtained the requested information. "Dear Friend" letters, similar to those referred to in note 37, and retainer agreements were sent by the out-of-state attorney to the families of the deceased crew members and to the surviving crew members. He in turn engaged local counsel and then the lawsuits were commenced in this district.

39. *See* Canons of Professional Ethics, Canons 27 and 28.

40. Heine v. New York Life Ins. Co., 50 F.2d 382, 387 (9th Cir. 1931).

41. C.Civ. art. 2947. *See* affidavit of Berlingieri, September 20, 1968, ¶ 39.

ing forces, must necessarily offer to sustain their conflicting contentions as to who bears responsibility for the disaster. Plaintiffs would be in a position to present a far stronger evidential case to support their claims than if the trials were permitted here, where, in addition to complex choice of law issues, they would also have the heavy burden of difficult problems of proof. In Italy they would also have available the findings of fact made by the Genoa Board of Inquiry especially convened to inquire into the causes of the disaster, which, under Italian law, constitute prima facie evidence in all actions arising out of the disaster;[42] in fact, the Tribunal of Rome has already ordered they be made part of the pending proceedings before it. In sum, the conclusion is compelled that not only are plaintiffs deprived of no right by remitting them to their home forum, but that justice would be more readily achieved there.[43]

In light of the disposition made herein, it is unnecessary to pass upon the defendants' further claim that these actions are barred under applicable statutes of limitations.

---

42. C.Nav. art. 582. *See* affidavit of Berlingieri, September 20, 1968, ¶ 37.

43. It should also be observed that plaintiffs, if so advised, can commence actions in Iran, which has a 10-year statute of limitations. Civil Procedural Code, Art. **737.** *See* affidavit of Omid, September 24, 1968, ¶ 5(f).